NS:KCB/DEL/EJD
F. #2018R01984

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                        Cr. No. <u>18-609 (S-3) (RJD)</u>

ARTHUR CODNER,
ALFRED LOPEZ,
HIMEN ROSS,
BUSHAWN SHELTON and
ANTHONY ZOTTOLA, SR.,

                Defendants.

– – – – – – – – – – – – – – – – – – – –X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION <u>FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY</u>

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kayla Bensing
Devon Lash
Emily Dean
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in this case, which is scheduled for trial on August 24, 2022.  For the reasons set forth below, the government respectfully requests that (1) the identities of all prospective jurors, including their names, addresses and places of employment, not be revealed to either party or their attorneys; and (2) from the time each juror is empaneled until the conclusion of the trial, the jurors eat lunch together and be accompanied in and out of the courthouse by members of the United States Marshals Service each day so that they do not mingle in the courthouse with the public or any potential trial spectator.  These measures are necessary to assure the public's right to a fair trial by protecting the jury from improper influence or intimidation.  Moreover, these precautions will not deprive the defendant of meaningful jury selection, diminish the presumption of innocence, or cause any prejudice.

BACKGROUND

I.      The Charged Crimes

This case arises out of defendants' conspiracy and multiple attempts to murder Sylvester Zottola and his son, Salvatore Zottola.  The defendants engaged in series of violent attacks that spanned a thirteen-month period, and ultimately resulted in the murder of Sylvester Zottola on October 4, 2018.

On January 14, 2021, a grand jury in the Eastern District of New York returned a third superseding indictment (the "Indictment") charging defendants Arthur Codner, Alfred Lopez, Himen Ross, Bushawn Shelton, and Anthony Zottola (together, the

"Defendants")[1] with the following crimes: murder-for-hire conspiracy, in violation of 18 U.S.C. § 1958(a); murder-for-hire, in violation of 18 U.S.C. § 1958(a); unlawful use and possession of firearms, in violation of 18 U.S.C. § 924(c); and causing the death of Sylvester Zottola through the use of a firearm, in violation of 18 U.S.C. § 924(j).  Additionally, the grand jury charged defendant Bushawn Shelton with three additional counts: possession of a firearm as a previously convicted felon, in violation of 18 U.S.C. § 922(g); perjury, in violation of 18 U.S.C. § 1621(2); and possession of contraband in prison, in violation of 18 U.S.C. § 1791.

On October 4, 2018, 71-year-old Sylvester Zottola, the father of defendant Anthony Zottola, was shot and killed while sitting in his car at a McDonald's drive-thru in the Bronx.  As the government will prove at trial, defendant Anthony Zottola orchestrated and financed multiple attacks on his father, as well as attacks against his brother Salvatore Zottola, by hiring Shelton, a high-ranking member of the Murderous Maddawg set of the Bloods street gang.  Shelton then enlisted other gang members to fulfill the contract, including defendant Himen Ross, the shooter who fired the shots that killed Sylvester Zottola at the McDonald's drive-thru, and defendant Alfred Lopez, the getaway driver for the homicide.

A series of violent episodes targeting Sylvester Zottola and Salvatore Zottola occurred prior to Sylvester Zottola's murder in October 2018.  In approximately September 2017, defendant Branden Peterson approached Sylvester Zottola near his residence, as

---

[1]      The Indictment additionally charged several other defendants, including Herman Blanco, Jason Cummings, Branden Peterson, Julian Snipe, and Kalik McFarlane, who have pleaded guilty or are expected to plead guilty before the scheduled trial date.

captured on video surveillance.  Peterson briefly inquired about a job, but then punched Sylvester Zottola in the face and body repeatedly before fleeing.  Peterson's assault was coordinated with Anthony Zottola and Shelton; before the assault, Peterson informed Shelton about police presence near Sylvester Zottola's home, and Shelton subsequently relayed the information to Anthony Zottola.

Two months later, Sylvester Zottola was attacked again.  On the afternoon of November 26, 2017, Sylvester Zottola was driving when a dark van pulled in front of his car, forcing him to stop.  An individual wearing a face mask and gloves exited the van and pointed a gun at Sylvester Zottola, who was able to flee his vehicle and notify law enforcement.  Police officers recovered the van at the scene and also found a distinctive checkered face mask and brown jacket nearby.  Prior to the incident, Peterson sent Shelton a photograph of what appeared to be the same face mask as the one recovered at the scene.  A forensic analysis identified Shelton's DNA on the mask and the jacket.  After the encounter, Shelton and Anthony Zottola exchanged coded text messages, referring to Sylvester Zottola as "the actor" and his murder as "the scene."  In one text, Shelton wrote that "[t]oday was set to be the end finally until the actor wanted to do his own stunts and throw it in reverse in the middle of shooting a scene and drive in the opposite direction."  Anthony Zottola replied, "[o]k. But we can still do the end I hope."  Shelton later texted Anthony Zottola that he was "putting together a new cast," and that they were "going to film in his dressing room [i.e. Sylvester Zottola's residence]."

On December 27, 2017, three men perpetrated a gunpoint home invasion of Sylvester Zottola's residence.  One of the men struck Sylvester Zottola and knocked him to the floor.  Another man stabbed Sylvester Zottola multiple times in the neck and slashed his

throat.  The three men stole approximately $3,000 from the residence before leaving.  Earlier

that day, Anthony Zottola texted Shelton, saying that he had the "keys to the dressing room

[i.e. Sylvester Zottola's residence] so that he has to finish tonight cause the people who live

in the studios above are gone for the evening but just tonight."  Shelton and Anthony Zottola

then agreed to meet at Anthony Zottola's garage later that afternoon.

On May 1, 2018, defendant Jason Cummings broke into an office used by

Sylvester Zottola and Salvatore Zottola, which was connected to Sylvester Zottola's

residence.  Shelton had driven Cummings to the office, and minutes before the break-in,

Shelton texted Cummings the four-digit passcode to the office and provided detailed

instructions.  Cummings was forced to flee the office because of police presence in the area,

and he texted Shelton:  "I can run toss the tool in the water but I gotta get out of here."

On June 12, 2018, Sylvester Zottola was at home when a dark-colored Honda,

driven by Ross, drove past his residence several times. The Honda then parked near the

residence, and an individual holding a gun exited the vehicle.  Sylvester Zottola, who was

also armed, fired a shot at the individual, forcing him to flee back into the Honda.  After the

incident, Sylvester Zottola was arrested for possession of a firearm.  Coincidentally,

approximately one hour after the shooting, police officers in Manhattan conducted a traffic

stop of the Honda, from which Ross fled on foot.  Police recovered a gun, mask, and gloves

from the Honda.

On the morning of July 11, 2018, at approximately 6:30 a.m., Salvatore

Zottola parked his vehicle in front of his residence in the Bronx. A red Nissan Altima pulled

up, and an individual exited from the vehicle, displaying a firearm.  The individual shot

Salvatore Zottola several times, striking him in the head, torso, and hand.  The shooter then

fled in a red Nissan.  Salvatore Zottola underwent surgery for his injuries but ultimately survived.

On July 10, the day before the shooting of Salvatore Zottola, Anthony Zottola texted Shelton, writing that "the fisherman [i.e. Salvatore Zottola] went on a trip for three days. Just so you know. All docks are empty."  Zottola then asked to meet Shelton later at a nearby chain restaurant.  Shortly after that meeting, Shelton began texting defendant Julian Snipe about borrowing a car.  A few hours after the shooting, Anthony Zottola texted Shelton, "[d]ealing with a headache from this morning." Shelton replied, "[y]eah I also had a migraine from this morning and I wanted to pick your brain."  Two days after the shooting, Shelton and Ross exchanged text messages that they needed to "clean up."

On October 4, 2018, the defendants succeeded in murdering Sylvester Zottola at a McDonald's drive-thru.  Video surveillance and records show that less than a week before Sylvester Zottola was murdered, Shelton, Ross and defendant Herman Blanco used a tracking device that was later recovered from Sylvester Zottola's car after the murder.  Cell-site data and text message correspondence shows that Ross, Blanco, and Lopez met on the morning of October 4, 2018.  Lopez and Ross then proceeded to follow Sylvester Zottola using the tracking device on his car.  Lopez drove Ross to the McDonald's, and Ross shot and killed Sylvester Zottola through his car window.  According to witnesses, Ross then fled the McDonald's parking lot on foot and re-entered Lopez's waiting vehicle.  At approximately 4:47 p.m., Ross texted Shelton, "Done."  At approximately 4:50 p.m., Shelton texted Ross, "Kopy."

Several minutes later, Shelton texted Anthony Zottola, "[c]an we party today or tomorrow?"  After exchanging several messages, Anthony Zottola texted Shelton, "It's my

5

lil man bday I am taking him to his favorite place mc Donalds than a movie. Lol. Like I eat that stuff. Thank you for being a great friend my man."  After agreeing to meet the following day, Anthony Zottola sent a coded message saying that he would have "the cases of water in a day or so."  A picture recovered from one of Shelton's cellular telephones depicts a cardboard box of bottled water, as well as over $200,000 in banded currency.  On October 11, 2018, during Shelton's arrest and the execution of a search warrant at his residence, law enforcement agents recovered approximately $45,000 in banded cash.

II.     The Defendants

With the exception of Zottola, the remaining defendants are associates or members of the Bloods street gang, a violent criminal enterprise responsible for murders, kidnappings, robberies and assault.  Specifically, Shelton is a high-ranking leader of the Murderous Maddawg set of the Bloods; Codner and Lopez are associated with the Gorilla Stone set of the Bloods; and Ross is a member of the Bloods (but did not specify a particular set), giving each access to a network of gang members and associates to engage in criminal activity or intimidation efforts even while the defendants are incarcerated.

In addition to these memberships and associations, at least two defendants have a history of violence or weapons convictions predating the conduct charged in the Indictment.  Shelton has two prior convictions involving weapons, one of which was overturned.[2]  In 2010, he pled guilty to criminal possession of a weapon in the second degree

---

[2] In 2008, Shelton (along with co-defendant Herman Blanco) was convicted by a jury of felony assault and burglary, in connection with the burglary of a narcotics stash house.  Shelton's cousin, a co-conspirator in the burglary, was killed during the course of the crime by a bullet fired from one of the co-conspirators' guns as one of the victims struggled to gain control of the gun.  However, in 2012, the New York Supreme Court, Appellate Division, reversed Shelton's conviction after determining that the trial court failed to instruct

in Queens County Supreme Court, for which he was sentenced to 42 months' imprisonment and 30 months' supervised release.  Ross has two felony convictions in Bronx County Supreme Court:  an attempted assault in the second degree while confined in a correctional facility, stemming from an incident in 2011, and a conviction for knowingly making or possessing dangerous contraband in prison in the first degree stemming from an incident in 2012.  In both cases, Ross was sentenced to one to three years' imprisonment.

Certain of the defendants also have engaged in obstructive or illicit behavior during arrest and pretrial detention.  For example, Shelton is charged with perjury in connection with his October 11, 2018 statement on a financial affidavit, submitted to the United States District Court for the Eastern District of New York, that he had $5,500 in cash on hand or money in checking or savings accounts.  Earlier that day, during Shelton's arrest and the execution of a search warrant at his residence, approximately $45,000 in banded cash was recovered by law enforcement.

Ross and Lopez have both received disciplinary infractions while incarcerated for rules violations and threats, respectively.  An MDC investigation revealed that on January 9, 2020, Ross received items from a visitor, which he attempted to covertly place inside his clothing.  Ross was x-rayed on January 9, 11 and 13, and staff observed unknown items inside his body on each occasion, which when examined included 26 grams of tobacco, 10 grams of a substance that tested positive for marijuana, and another 10 grams of a substance

---

the jury as to an accomplice-corroboration charge and failed to ensure the prosecution laid a proper foundation prior to impeaching an alibi witness's credibility.  See People v. Shelton, 951 N.Y.S.2d 69 (2d Dep't 2012).  After the reversal, the Queens County District Attorney's Office elected not to retry Shelton.  Blanco served a 150-month term of imprisonment for his role in the crime.

that tested positive for marijuana.  On February 2, 2022, Lopez received a disciplinary infraction at Hudson County Correctional Facility in connection with threats of violence toward a correctional officer after he blocked his cell door with a mattress, refused to leave his cell and threatened to harm any officer who attempted to move him, according to a report.

III.     Attempts to Interfere with the Judicial Process

In addition to the spree of violent attacks on Sylvester and Salvatore Zottola, certain of the defendants engaged in several acts that demonstrate an ongoing effort to interfere with and obstruct the government's investigation.

Anthony Zottola has contacted a key witness the government expects will testify at trial — his brother Salvatore.[3]  For example, while incarcerated, Anthony Zottola sent a letter to Salvatore Zottola in July 2019, stating that "from the time [they] were born [they] have been best friends."  He then wrote that their father "taught [them] to love each other," that "[Anthony has] always had [Salvatore's] side, believe it or not," and that "no matter what [they] were there for each other."  Given Anthony Zottola's knowledge that Salvatore was cooperating with law enforcement, this letter was a clear attempt to influence his brother's expected testimony against him.  Anthony Zottola has also informed at least one

_____

[3]     In addition, Anthony Zottola followed law enforcement's investigation into the attacks against Sylvester Zottola before his murder.  For example, in July 2011, Anthony Zottola drove Sylvester Zottola to the FBI New York Field Office to meet with agents from the FBI to discuss the ongoing attacks.  During the meeting, FBI agents met with Sylvester Zottola privately but Anthony Zottola remained inside of the building and spoke to agents. Zottola also participated in conversations with family members and others regarding brainstorming who could be responsible for the attacks against his father and brother, even arranging for the hiring of "security"—all while orchestrating the attacks himself.  The monitoring of the federal investigation and controlling the "security" of his father enabled Anthony Zottola, who was ultimately responsible for the attacks, to follow the investigation, determine whether he (Anthony Zottola) was under suspicion and evade detection.

witness that he (Anthony Zottola) was mad that the witness was cooperating in the investigation.

Shelton too has attempted to interfere with the judicial process.  When Shelton was arrested on October 11, 2018, law enforcement agents executed a judicially-authorized search warrant at Shelton's residence and recovered several cellular telephones from Shelton's residence.  Shelton's wife, Takeisha Shelton, subsequently contacted law enforcement agents on two occasions, told them that one of the devices seized pursuant to the warrant belonged to her, and sought its return.  The contents of the device, however, revealed the phone was used by Bushawn Shelton and it contained several incriminating communications between Shelton and Anthony Zottola that were exchanged shortly after Sylvester Zottola's murder on October 4, 2018.  In another example, Shelton is charged in the Indictment with possessing contraband in prison (Count Seven), namely a cell phone, which he used from prison to contact Anthony Zottola multiple times, including between December 20, 2018 and December 23, 2018.

IV.   Media Coverage

The government anticipates that trial in this matter is likely to attract significant media coverage.  Indeed, this case has already garnered significant and widespread media attention.

For example, in the wake of the July 11, 2018 attempted murder of Salvatore Zottola, several media outlets published details of the shooting and released surveillance footage from that morning. See, e.g., Larry Celona, Tina Moore, Kevin Sheehan & Natalie Musumeci, Son of Bonanno Crime Family Associate Shot Near His Bronx Home, N.Y. Post (July 11, 2018), https://nypost.com/2018/07/11/bonanno-crime-family-associate-shot-near-

his-bronx-home; Thomas Tracy, Emilie Ruscoe & Larry McShane, <u>Attempted Mafia Rubout</u>
<u>Eyed in Bronx Shooting of Man Whose Father Was Targeted Just Weeks Ago</u>, N.Y. Daily

News (July 11, 2017), https://www.nydailynews.com/new-york/ny-metro-mobster-shot-

bronx-20180711-story.html; Eric Shorey, <u>Video Shows Alleged Bronx Mob Associate</u>

<u>Miraculously Surviving Botched Hit</u>, Oxygen (July 13, 2018),

https://www.oxygen.com/crime-time/video-shows-alleged-bronx-mob-associate-salvatore-

zottola-miraculously-surviving-botched-hit; Erin Laviola, <u>Salvatore Zottola: 5 Fast Facts</u>

<u>You Need to Know</u>, Heavy.com (October 4, 2018),

https://heavy.com/news/2018/07/salvatore-zottola/.

        Multiple local and national news outlets reported on the October 4, 2018

murder of Sylvester Zottola and displayed pictures of the crime scene. <u>See, e.g.</u>, Eyewitness

News, <u>NYPD: Reputed Mobster Sylvester Zottola Killed While Waiting at McDonald's</u>

<u>Drive-Thru in the Bronx</u>, ABC N.Y. (Oct. 4, 2018), https://abc7ny.com/mcdonalds-drive-

thru-through-bronx/4414447/; Adam Kuperstein & Ray Villeda, <u>Man With Mob Ties Shot,</u>

<u>Killed at McDonald's Drive-Thru in Bronx, Months After His Son Was Attacked by</u>

<u>Gunman: Sources</u>, NBC N.Y. (October 5, 2018),

https://www.nbcnewyork.com/news/local/sylvester-zottola-ties-to-bonanno-crime-family-

shot-killed-mcdonalds-bronx-months-after-son-attacked-botched-mob-hit-throgs-

neck/1820953/; Ali Watkins & Emily Palmer, <u>Hunted for Months, Reputed Mobster Is</u>

<u>Gunned Down at McDonald's,</u> N.Y. Times (Oct. 4, 2018),

https://www.nytimes.com/2018/10/04/nyregion/sylvester-zottola-dead-bonanno-bronx.html;

Chris Dyer, <u>Sleeping With The Fishes: New York Mobster Is Pictured Lying Motionless in</u>

<u>His Car in a McDonald's Drive-Thru After He Was Executed While Waiting For Coffee,</u>

Daily Mail (Oct. 5, 2018), https://www.dailymail.co.uk/news/article-6245557/New-York-

mobster-pictured-lying-motionless-car-McDonalds-drive-executed.html; Amy Lieu, Reputed

NYC Mobster Fatally Shot at McDonald's Drive-Thru: Reports, Fox News (Oct. 5, 2018),

https://www.foxnews.com/us/reputed-nyc-mobster-fatally-shot-at-mcdonalds-drive-thru-

reports; Michael Daly, Hit on Sylvester Zottola at McDonald's Shows They Don't Make

Mob Rubouts Like They Used To, Daily Beast (Oct. 9, 2018),

https://www.thedailybeast.com/hit-on-sylvester-zottola-at-mcdonalds-shows-they-dont-

make-mob-rubouts-like-they-used-to.

After Shelton's arrest on October 11, 2018, several news sources reported that

Shelton, a "high-ranking member of the Bloods," had orchestrated the plot to murder

Sylvester Zottola, and speculated about a connection between the murder and organized

crime. See, e.g., Ali Watkins, Arrest in Deadly Vendetta Against Mob Figure Only Thickens

the Plot, N.Y. Times (Oct. 11, 2018), https://www.nytimes.com/2018/10/11/nyregion/bronx-

assassination-mafia-arrest.html; Jake Offenhartz, Brooklyn Man Arrested For Allegedly

Plotting Hit on Bonanno Family Associates, Gothamist (Oct. 12, 2018),

https://gothamist.com/news/brooklyn-man-arrested-for-allegedly-plotting-hit-on-bonanno-

family-associates; Graham Rayman, Kerry Burke & Leonard Greene, Brooklyn Ex-Con

Arrested in Connection With Bronx McDonald's Mob Hit, N.Y. Daily News (Oct. 11, 2018),

https://www.nydailynews.com/new-york/nyc-crime/ny-metro-mob-murder-arrest-20181011-

story.html; Kathleen Joyce, High-Ranking Bloods Gang Member Behind Hit on NYC

Mobster At McDonald's Drive-Thru, Cops Say, Fox News (Oct. 12, 2018),

https://www.foxnews.com/us/high-ranking-bloods-gang-member-behind-hit-on-nyc-

mobster-at-mcdonalds-drive-thru-cops-say; Keith Griffith, High-Ranking Bloods Gang

Member is Charged With "Plotting to Kill" New York Mobster Who Was Gunned Down at a McDonald's Drive-Thru in Broad Daylight, Daily Mail (Oct. 12, 2018), https://www.dailymail.co.uk/news/article-6270803/Bloods-gang-member-charged-plot-kill-mobster-slain-Bronx-McDonalds.html.

When Anthony Zottola was arrested for his father's murder on June 17, 2019, the case garnered even more national press coverage. See, e.g., Tim Elfrink, An Execution Looked Like a Mafia Vendetta. But the Man's Son Planned the Hit, Feds Say, Wash. Post (June 19, 2019), https://www.washingtonpost.com/nation/2019/06/19/anthony-zottola-sylvester-zottola-mafia-assassination-murder-hire-bloods/; AP, Son Charged in Mob Father's Slaying at McDonald's Drive-Thru, Failed Attack on Brother, CBS News (June 19, 2019), https://www.cbsnews.com/news/anthony-zottola-sr-charged-in-mob-fathers-slaying-at-mcdonalds-drive-thru-failed-attack-on-brother/; Ray Sanchez, New York Man Accused of Murder-For-Hire Plot Against His Father and Brother, Prosecutor Says, CNN (June 19, 2019), https://www.cnn.com/2019/06/19/us/new-york-indictment-murder-for-hire/index.html; Trevor Boyer & Larry McShane, Death Penalty Hangs Over 10 Defendants in Bronx Drive-Through Murder of Mobster 'Sally Daz' Zottola, Failed Hit On His Son, N.Y. Daily News (July 30, 2019), https://www.nydailynews.com/new-york/nyc-crime/ny-bronx-mob-hit-20190730-37fvhfoeqzbwjb4gq3t7un6qmy-story.html.

ARGUMENT

I.    Legal Standard

The Second Circuit has repeatedly upheld the use of anonymous juries to protect the integrity of a trial and ensure an impartial jury. See, e.g., United States v. Napout, 963 F.3d 163, 189 (2d Cir. 2020); United States v. Prado, 634 F. App'x 323, 325 (2d Cir.

2016); United States v. Kaziu, 559 F. App'x 32, 38 (2d Cir. 2014); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013); United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); United States v. Pica, 692 F.3d 79, 81 (2d Cir. 2012); United States v. Quinones, 511 F.3d 289, 291 (2d Cir. 2007); United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006); United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Thai, 29 F.3d 785, 800-01 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264-65 (2d Cir. 1994); United States v. Locascio, 6 F.3d 924, 946-47 (2d Cir. 1993); United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991); United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989); United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); United States v. Thomas, 757 F.2d 1359, 1364-65 (2d Cir. 1985); United States v. Barnes, 604 F.2d 121, 133-43 (2d Cir. 1979).

The Second Circuit has adopted a two-step process for district courts to follow in connection with empaneling an anonymous jury. First, a district court should determine whether there is strong reason to believe that the jury needs protection. Second, if the court determines that anonymity is necessary to protect the jury, then the court should take reasonable precautions to minimize any prejudice that might arise from an anonymous jury. See Paccione, 949 F.2d at 1192. Importantly, "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." Aulicino, 44 F.3d at 1116. Thus, "the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Paccione, 949 F.2d at 1192.

To determine whether there is reason to believe the jury's safety and impartiality needs protection, courts in this circuit have considered various factors: (1) the dangerousness of the defendants; (2) whether the defendants or their associates have engaged in past attempts to interfere with the judicial process; (3) whether the defendants have access to the means to harm the jury; and (4) whether the trial is likely to attract media attention and publicity. See United States v. Wilson, 493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (Garaufis, J.) (citing Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33 (2d Cir. 1989)).  Notably, all of these factors need not be present; "anonymity is appropriate when some combination of these factors is present." United States v. Ashburn, 13-CR-0303 (NGG), 2014 WL 5800280, at *3 (E.D.N.Y. Nov. 7, 2014) (internal quotation marks omitted).

Courts assess defendants' dangerousness by the seriousness of the charged crimes, including whether the defendants are charged with participating in a large-scale criminal enterprise. See, e.g., Gotti, 459 F.3d at 346 (noting defendants were charged with membership in an organized crime family); Wilson, 493 F. Supp. 2d at 399-401 (noting defendant was charged with murdering two police officers and was a member of a violent gang).

With respect to a defendant's past attempts to tamper with the judicial process, courts look for evidence of previous intimidation, bribing, or violence toward witnesses or jurors.  See, e.g., Aulicino, 44 F.3d at 1116 (noting defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence);  Paccione, 949 F.2d at 1192-93 (noting government witness had received anonymous, middle-of-the-night phone calls advising him to "remember[] nothing" and a defendant had threatened others with a baseball

bat and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached grand jury witness).  When a defendant is under pretrial detention, whether he has means to harm the jury often hinges on the extent of his connections outside of prison.  See, e.g., Wilson, 493 F. Supp. 2d at 400 (granting a motion for an anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial.").

Finally, whether the trial is likely to attract media attention may be illustrated by the nature and degree of pretrial publicity. See, e.g., Paccione, 949 F.2d at 1193 (noting the case had already been "front-page news"); Vario, 943 F.2d at 240 (citing a single New York Newsday cover story).

When the court determines that anonymity is necessary to protect the jury, two procedures adequately protect a defendant's right to an unbiased jury.  First, the court should "conduct a voir dire designed to uncover bias as to issues in the case[ ] and as to the defendant himself." Paccione, 949 F.2d at 1192.  Second, to reduce the possibility that the jury will infer that the defendants are dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures."  Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116. In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media.  See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; Thomas, 757 F.2d at 1363.

II.     There is Strong Reason to Believe That the Jury's Impartiality
        Needs Protection in This Case

15

Applying the standards and considering the factors set forth above, the interests of justice would best be served in this case by protecting the identities of the jurors.

A.    The Defendants Are Dangerous

First, the Defendants are dangerous and, based on the evidence to be presented at trial, they are likely to be perceived by the jurors as dangerous.  The trial evidence will illustrate the defendants' sustained plot to kill two individuals.  The government will offer evidence showing multiple attempts on different occasions to kill or seriously injure the victims in a variety of ways.  More specifically, the evidence will, inter alia, show that the defendants (1) coordinated the beating of Sylvester Zottola in front of his home, (2) forced Sylvester Zottola to stop driving at gunpoint in what he believed was an effort to kidnap him, (3) arranged for Sylvester Zottola to be stabbed multiple times, in a brazen home invasion in which Zottola's throat was slashed and bleach was poured at the scene, (4) broke into the office of Sylvester Zottola in an attempt to murder him, (5) shot Salvatore Zottola multiple times from point blank range in front of his home, nearly killing him, and finally, (6) successfully killed Sylvester Zottola while he was sitting in a McDonald's drive-thru.

The length and breadth of the conspiracy demonstrates that the defendants were determined to accomplish their goal of murdering Sylvester and Salvatore Zottola.  The evidence presented at trial will show that Shelton, directed and financed by Anthony Zottola, had the means to recruit at least eight other individuals who were willing to execute a spree of assaults, home invasions, stabbings, and shootings.  Shelton's extensive recruitment efforts are indicative of his connections to a network of violent actors, a factor that weighs in favor of a sequestered jury.  See, e.g., Gotti, 459 F.3d at 346 (noting that the defendant was a member of an organized crime network; Amuso, 21 F.3d at 1264 (crediting that the

16

defendant was the head of a crime organization).  The trial evidence will also reveal the defendants' ability to use law enforcement techniques; namely, the surreptitious installation of a GPS tracking device on Sylvester and Salvatore Zottola's cars to track and surveil the victims' movements for an extended period of time.

   In these circumstances, the fact that jurors are aware that their identities are publicly known may subtly and unconsciously impair their impartiality.  Indeed, this is precisely the type of criminal conduct that "would cause a juror to reasonably fear for his own safety."  Vario, 943 F.2d at 241.  In Barnes, the Second Circuit explained one of the important reasons for empanelling anonymous juries in cases like this:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity, . . . this is as it should be – a factor contributing to his impartiality.

604 F.2d at 140-41 (internal quotation marks and citation omitted) (affirming district court's use of an anonymous, sequestered jury because it "comported with its obligation to protect the jury, to assure its privacy, and to avoid all possible mental blocks against impartiality").

   Similarly, in Thomas, the Second Circuit found that the protection of jurors is vital to the function of the criminal justice system and further articulated the importance of using jury anonymity as a mechanism to ensure a jury's fair and impartial verdict free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict.

757 F.2d at 1364.  Accordingly, this factor weighs in favor of juror anonymity.

B.     The Defendants Have Attempted to Interfere with the Judicial Process

The Defendants have previously attempted to obstruct justice, a factor that weighs heavily in support of anonymity.  As detailed above, the Defendants, together with others on their behalf, have a history of obstructive conduct, including (1) Anthony Zottola's attempts to monitor the investigation in this case by accompanying his father to meetings with law enforcement, (2) Anthony Zottola's attempts to dissuade a witness from cooperating with law enforcement and reminding his brother in a letter from prison that "no matter what [they] were there for each other," (3) Shelton's attempt to recover a cellular telephone from law enforcement that contained incriminating communications between Shelton and Anthony Zottola, and (4) Shelton's possession of a contraband cell phone in prison, which he used to communicate with Anthony Zottola before Zottola's arrest.

The facts underlying several of these incidents shows that the defendants' pretrial detention did not prevent them from attempting to interfere with the judicial process. Furthermore, as noted above, Shelton's demonstrated ability to recruit individuals that will commit criminal acts at his direction is illustrative of his connections outside of prison.  See, e.g., Wilson, 493 F. Supp. 2d at 400 (citing the defendant's participation in a violent gang).

C.     Media Coverage of this Case Will Expose Jurors to Extraordinary Pressure

Since the attempted murder of Salvatore Zottola in July 2018, this case has garnered significant attention from both national and local media sources; media coverage can be expected to increase during trial. As detailed above, the murder of Sylvester Zottola and the arrests of Shelton and Anthony Zottola have received widespread coverage in print

and internet outlets.  This factor weighs heavily in support of empaneling an anonymous jury.

The expected media attention may put significant pressure on jurors to reach a verdict based on considerations other than the evidence presented at trial, such as avoiding the notoriety associated with the defendants or conversely, seeking fame.  Notably, courts have ordered anonymous juries in cases with substantial media coverage, even where neither the defendant nor his associates had any documented history of jury or witness tampering. See, e.g., Kadir, 718 F.3d at 121 (affirming the lower court's decision to empanel an anonymous jury where defendants were charged with violent crime and there was extensive media coverage of the case); United States v. Wong, 40 F.3d 1347, 1377 (2d Cir. 1994).

In Barnes, the Second Circuit upheld the empaneling of an anonymous jury and noted that "in a case that generated as much pretrial publicity as [Barnes] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities."  604 F.2d at 141.  The government respectfully submits that, under the circumstances of this case, this factor weighs heavily in favor of the empaneling of an anonymous jury.

*** 

For the foregoing reasons, an anonymous and partially sequestered jury is warranted in this case.

III.     An Anonymous Jury Will Not Prejudice the Defendant

Once a district court determines that there is strong reason to believe that the jury needs protection, it may empanel an anonymous jury provided it takes reasonable precautions to minimize any potential prejudice to the defendant.  See, e.g., United States v.

Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003) (granting motion for anonymous jury and noting the requirement "that a balance be struck between the government's interest in the judicial process and the defendant's interest in preserving and safeguarding the presumption of innocence"); Thai, 29 F.3d at 801; Amuso, 21 F.3d at 1264-65; Paccione, 949 F.2d at 1192; Vario, 943 F.2d at 239; Tutino, 883 F.2d at 1132; Persico, 832 F.2d at 717-18; Thomas, 757 F.2d at 1365.  A defendant has two legitimate concerns that are potentially affected by a decision to empanel an anonymous jury: (1) the right to make informed choices during the jury selection process, and (2) the right to be tried by jurors who are not prejudiced by reason of their anonymity.  Both of these concerns can be readily addressed.

A.      An Anonymous Jury Will Not Burden the Defendants' Ability
        To Make Informed Choices During Jury Selection

        Although a defendant has the right to a meaningful voir dire of potential jurors, see Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981), the decision as to the questions to be asked in voir dire largely rests within the informed discretion of the trial judge.  See United States v. Silva, 715 F.2d 43, 50 (2d Cir. 1983) (absent a clear abuse of discretion, trial court's ruling on questions to be asked will not be disturbed); United States v. Barnes, 604 F.2d 121, 137-40 (2d Cir. 1979) (noting that "as long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal").

        The information that will be kept from the parties and counsel if this motion is granted — namely, the names, addresses and places of employment of prospective jurors — is not crucial to the jury selection process.  In selecting jurors, the parties will learn, among

other things, the geographic area in which prospective jurors reside, the general nature of their employment, their age, and the level of their formal education.  Indeed, the government does not oppose the defendants' request to use a written juror questionnaire during <u>voir dire</u>.  <u>See</u> ECF No. 359.  The names of prospective jurors, to the extent they provide information about ethnicity, are not needed for a meaningful <u>voir dire</u>.  <u>See</u> <u>Georgia v. McCollum</u>, 505 U.S. 42 (1992) (rule articulated in <u>Batson</u>, prohibiting use of peremptory challenges in racially discriminatory manner, applies to defendant).

       B.     <u>An Instruction Will Diminish the Risk of Prejudice to the Defendants</u>

       Numerous courts have recognized that, where anonymity is necessary, the Court can instruct the jury as to why anonymity is appropriate in a neutral manner that minimizes any risk of prejudice.  Although the due process clause of the Fifth Amendment protects the presumption of innocence, "there is no per se rule that it may not be burdened." <u>Thomas</u>, 757 F.2d at 1364; <u>see also</u> <u>United States v. Scarfo</u>, 850 F.2d 1015, 1026 (3d Cir. 1988).  Here, the burden is slight compared to the interests in safeguarding the integrity of the judicial process and can be minimized through a proper jury instruction.

       Most commonly, courts have explained to jurors that their privacy and their identities require protection from the media and the public. <u>See, e.g.</u>, Memorandum & Order, <u>United States v. Basciano</u>, 03-CR-929 (E.D.N.Y. Nov. 17, 2005) at 5 (Docket No. 354); <u>United States v. Amato</u>, 306 Fed. Appx. 630, 2009 WL 59165, at *3 (2d Cir. Jan. 12, 2009) (summary order); <u>Thai</u>, 29 F.3d at 801; <u>Amuso</u>, 21 F.3d at 1265; <u>Tutino</u>, 883 F.2d at 1133. In some cases, the court has explained the jury's partial anonymity by telling prospective jurors that anonymity would allow them to feel more comfortable in giving candid answers to the personal questions asked in <u>voir dire</u>.  Either of those examples would provide a

credible explanation to prospective jurors in this case. Indeed, the intense media scrutiny expected to surround the trial is, in fact, a basis for the instant motion.

As for partial sequestration, the government proposes that the jurors be told that they are being escorted in and out of the courthouse to protect their privacy and in order to ensure a timely start to each day of trial.  This practice has been routinely followed in this District in recent years, and should be followed here as well.  See, e.g., United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 8482693, at *4 (E.D.N.Y. Oct. 9, 2020), reconsideration denied, No. 19-CR-286 (AMD), 2021 WL 431030 (E.D.N.Y. Feb. 8, 2021); United States v. Dervishaj, No. 13-CR-668 (ENV), 2015 WL 13842838, at *5 (E.D.N.Y. Mar. 19, 2015); United States v. Basciano, 05-CR-060 & 03-CR-929 (NGG); United States v. Stone, 05-CR-401 (ILG); United States v. McGriff, 04-CR-966 (FB); United States v. Wilson, 04-CR-1016 (NGG); United States v. Aguilar, 01-CR-1367 (RJD); United States v. Nelson, 94-CR-823 (DGT); United States v. Orena, 93-CR-1366 (ERK); United States v. Malpeso, 93-CR-1365 (RJD); United States v. Cutolo, 93-CR-1230 (EHN); United States v. Thai, 91-CR-838 (CBA).

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the venire and petit juries in this case be anonymous and partially sequestered.

Dated:      Brooklyn, New York
            June 21, 2022

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney
                                        Eastern District of New York


                              By:      _____/s/_____
                                        Kayla C. Bensing
                                        Devon Lash
                                        Emily J. Dean
                                        Assistant United States Attorneys
                                        (718) 254-6279/6014/6120


cc:      All counsel (by ECF)

23